UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

DONNIE SLOAN,                        )
                                     )
            Plaintiff,               )
                                     )
      v.                             )    No. 1:11 CV 72 SNLJ/DDN
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security      )
                                     )
            Defendant.               )

**REPORT AND RECOMMENDATION**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Donnie Sloan for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and for supplemental security income under Title XVI of that Act, §§ 1381, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the decision of the Administrative Law Judge (ALJ) be affirmed.

**I.  BACKGROUND**

Plaintiff Donnie Clarence Sloan, who was born in 1974, filed applications for Title II and Title XVI benefits on January 16, 2008. (Tr. 30, 183, 189.) He alleged an onset date of disability of December 15, 2007, due to chronic migraine headaches, a broken femur, head trauma, a stroke, broken bones in his right leg, a dislocated hip, bruised lungs and heart, broken ribs, and a broken sternum. (Tr. 183, 189, 212.) His applications were denied initially on June 13, 2008, and he requested a hearing before an ALJ.[1] (Tr. 84-88, 90-93.)

---

[1] Missouri is one of several test states participating in modifications to the disability determination procedures which apply in this case. 20 C.F.R. §§ 404.906, 404.966 (2007). These modifications
(continued...)

On May 12, 2010, following a hearing, the ALJ found plaintiff was not disabled. (Tr. 9-20.) On March 31, 2011, the Appeals Council denied plaintiff's request for review. (Tr. 1-3). Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On December 11, 2007, plaintiff, a smoker since age 10, saw Becky Jo Parks, M.D., complaining of vision problems. He also sought to be evaluated for multiple sclerosis. After discussing plaintiff's symptoms with Arun Varadhachary, M.D., Dr. Parks recommended an increased dosage of Topamax[2] and determined that plaintiff's symptoms were indicative of migraine headaches but not multiple sclerosis. Plaintiff had no acute distress. (Tr. 252-54.)

On December 16, 2007, plaintiff was brought to the emergency room at Poplar Bluff Regional Medical Center following a motor vehicle accident. J.W. Gieselmann, M.D., reported that plaintiff was drinking alcohol and crashed his automobile into a tree. Dr. Gieselmann noted an obvious fracture in plaintiff's right leg, which an x-ray later revealed to be a comminuted[3] fracture with floating pieces in the mid-shaft femur, a femoral neck fracture, a possible fracture of the right ankle, and a possible fracture of the left third rib. He complained of pain in the chest but denied having any pain in the head, neck, or abdomen. Dr. Gieselmann recorded plaintiff's blood pressure as 168/104. Plaintiff's heart rate was tachycardic.[4] (Tr. 256-67.)

---

[1](...continued)
include, among other things, the elimination of the reconsideration step. See id.

[2]Topamax is used to prevent and control seizures (epilepsy) and to prevent migraine headaches. WebMD, http://www.webmd.com/drugs (last visited June 18, 2012).

[3]Comminution is a breaking into several pieces, especially in describing a fracture. Stedman's Medical Dictionary 415 (28th ed. 2006).

[4]Tachycardia is rapid beating of the heart, conventionally applied to rates over 90 beats per minute. Stedman's at 1931.

On December 17, 2007, plaintiff was transferred to Barnes-Jewish Hospital under the care of John Mazuski, M.D. Dr. Mazuski described plaintiff as a well-developed, well-nourished male, in moderate distress secondary to pain. Dr. Mazuski confirmed that plaintiff sustained a right femoral neck fracture, a right femoral diaphyseal fracture, a right posterior malleolar fracture, and a right distal fibular fracture. Dr. Mazuski found that plaintiff had a bilateral internal carotid artery dissection and right middle carotid artery infarcts. He also had pulmonary contusions and a questionable left brachial plexus injury due to the fact that he was not moving his left extremities. Plaintiff again reported he had been drinking at the time of the accident, and was not sure whether he had lost consciousness after the motor vehicle crash. Dr. Mazuski recorded plaintiff's blood pressure as 140/90 and noted no weakness or stroke symptoms. Craig M. Coopersmith, M.D., the attending physician during rounds, noted that plaintiff had an abnormal echocardiogram with evidence of a right ventricular contusion with no wall abnormalities. The cardiology service cleared him for surgeries the following day. (Tr. 347-51.)

Later that day, plaintiff's respiratory status worsened. Dr. Coopersmith placed him on a thoracic epidural which did not improve his condition. Concerned by the possibility of imminent respiratory arrest, Dr. Coopersmith performed an awake bronchoscopic incubation on him. (Tr. 352.)

On December 18, 2007, Robert Brophy, M.D., performed surgery on plaintiff's right open femur fracture and femoral neck fracture. Dr. Brophy performed irrigation and debridement, closed reduction, on his right open femur fracture, and applied an external fixator on his femoral shaft fracture. On December 21, 2007, William M. Ricci, M.D., performed a second surgery on plaintiff. Dr. Ricci performed and open reduction and internal fixation of his right femoral neck fracture, a retrograde intramedullary nailing of his right femoral shaft fracture, an open reduction and internal fixation of his right medial malleolus fracture, an open reduction and internal fixation of his right distal tibia/fibula syndesmotic injury, a nonoperative treatment without manipulation of his right fibular shaft fracture, removal of the external fixator of his

right leg, and an irrigation and debridement of his right open femur fracture (skin to bone). (Tr. 353-57.)

Following a month long stay in the Surgical Intensive Care Unit where plaintiff was seen by the Vascular Laboratory for his internal carotid artery dissections, he spent several days in the Surgical Intensive Care Unit with pulmonary contusions that were worsening. On December 26, 2007, a percutaneous tracheostomy was performed on him. After a carotid angiogram on December 31, 2007, he was placed on Plavix.[5] On January 16, 2008, he was discharged from Barnes-Jewish Hospital to have physical and occupational therapy. (Tr. 347-48.)

On January 16, 2008, plaintiff began physical and occupational therapy at The Rehabilitation Institute of St. Louis. Upon admission, Jay Kottage, M.D., recalled his previous diagnoses and reasons for rehabilitation including the motor vehicle accident with bilateral carotid artery dissection and pseudoaneurysm, as well as vertebral artery dissection at C3-C4; a right femoral neck fracture; a right femur fracture; a right tib-fib fracture; a history of hypertension; a history of migraines; a history of ADHD; decreased function in mobility, self-care, likely judgment and safety awareness; and a tracheostomy.

Dr. Kottage also reported that plaintiff's prior head CT scan was negative, but a chest CT scan showed he had multiple rib fractures with pulmonary constructions, a small pericardial effusion, and multiple fractures in his right lower leg. A repeat head CT scan on December 27, 2007 showed ill-defined areas of his right posterior frontal lobe, subacute infarct. Plaintiff did not report to Dr. Kottage any nausea, vomiting, fevers, chills, chest pain, shortness of breath, diarrhea, or constipation. Dr. Kottage stated the range of movement in plaintiff's right leg and left arm was decreased. Dr. Kottage reported that plaintiff frequently complained of pain in his right leg but could walk and negotiate stairs. Dr. Kottage noted plaintiff's history of strokes

---

[5]Plavix is used to prevent heart attacks, myocardial reinfarction, unpredictable severe constriction chest pain, blood clots from going to the brain, etc. WebMD, http://www.webmd.com/drugs (last visited June 18, 2012).

including his prescriptions to Plavix and Lovenox,[6] and his history of alcohol abuse. Dr. Kottage stated that plaintiff's blood pressure appeared good while on Metoprolol[7] and listed his other current medications as Keflex, Oxycodone, Clonidine, Plavix, Lovenox, Naprosyn, Nystatin, and Calmoseptine.[8] (Tr. 402-05.)

The same day, plaintiff completed a Disability Report - Adult - Form SSA-3368. He listed the illnesses, injuries, or conditions that limited his ability to work as chronic migraines, a broken femur, head trauma, a stroke, broken bones in his right leg, a hip socket that was popped out, bruised lungs and heart, broken ribs, and a broken sternum. He stated that he could not walk or sit up, or even lay straight in a bed for very long. He also claimed that he could not use his left hand or left arm. He complained that severe headaches prevented him from working. (Tr. 211-18.)

On January 17, 2008, plaintiff was transported by ambulance to Barnes-Jewish Hospital complaining of chest pains. The Emergency Department Summary noted that upon triage, he was not experiencing weakness or stroke symptoms. Amanda M. Wood, M.D., discharged him back to the rehabilitation center after an electrocardiogram and troponin tests were negative for abnormalities. (Tr. 408-30.)

On February 4, 2008, plaintiff was discharged from The Rehabilitation Institute of St. Louis. Peter Taylor, M.D., reported that his hospital stay was uncomplicated, and that he did well in occupational

---

[6] Lovenox is used to prevent heart attacks, unpredictable severe constricting chest pain, deep vein thrombosis, and blood clots. WebMD, http://www.webmd.com/drugs (last visited June 18, 2012).

[7] Metoprolol is a beta-blocker used to treat cheat pain (angina), heart failure, and high blood pressure. WebMD, http://www.webmd.com/drugs (last visited June 18, 2012).

[8] Keflex is used to treat certain bacterial infections. Oxycodone is used to relieve moderate to severe pain. Clonidine is used to treat high blood pressure. Naprosyn is used to relieve pain from headaches, muscle aches, and tendinitis. Nystatin is used to treat fungal infections of various organs. Calmoseptine is used to treat skin irritations. WebMD, http://www.webmd.com/drugs (last visited July 2, 2012).

and physical therapy.  Dr. Taylor noted that he was decannulated[9] during his rehabilitation stay and that his tracheostomy site was closing nicely.  Dr. Taylor stated that he needed supervision while standing up and sitting down.  Plaintiff could walk 225 feet with a wheeled walker, and was rated modified independent with bed mobility eating, grooming, dressing, and using the bathroom with minimal assistance needed for shower transfers.  He was discharged with Clonidine, Plavix, Lopressor, Paxil, Vicodin, Prilosec, Ibuprofen, and Lunesta.[10]  (Tr. 401.)

On February 5, 2008, plaintiff returned to Barnes-Jewish Hospital for follow up x-rays with Dawn Hastreiter, M.D.  An ankle x-ray revealed a healed fracture of the medial malleolus and a healing fracture of the distal fibula.  A femur x-ray revealed healing fractures of the right femur with adjacent heterotopic ossification.  (Tr. 471-73.)

On February 15, 2008, plaintiff followed up with the Neurosurgery Department at Barnes-Jewish Hospital.  A Medical Record Note referred to his former multi-vessel dissection/aneurysm but stated his forearm and hand weakness from the middle cerebral artery thrombus had improved and his forearm and hands were fully functional with the exception of a weak grip.  He complained of right thigh and ankle pain related to fractures that was made worse by walking, thereby limiting his overall mobility. The same day, a cerebral angiogram was performed on plaintiff and overseen by Christopher J. Moran, M.D.  Dr. Moran noted persistent dissections with small pseudoaneurysms with 50 percent narrowing of the right internal carotid, unchanged left internal carotid artery pseudoaneurysms, resolution of the right vertebral carotid, unchanged left internal carotid artery pseudoaneurysms, resolution of the right

---

[9]Decannulation is the process whereby a tracheostomy tube is removed once a patient no longer needs it.  Johns Hopkins Medicine, http://www.hopkinsmedicine.org/tracheostomy/living/decannulation.html (last visited July 9, 2012).

[10]Lopressor is used to treat high blood pressure.  Paxil is used to treat depression, panic attacks, obsessive-compulsive disorder, anxiety disorders, and post-traumatic stress disorder.  Vicodin is used to relieve moderate to severe pain.  Prilosec is used to treat acid reflux and ulcers.  Lunesta is used to treat insomnia.  WebMD, http://www.webmd.com/drugs (last visited July 2, 2012).

vertebral artery aneurysm, and resolution of small thrombus with residual mild narrowing. (Tr. 435-69.)

On February 19, 2008, plaintiff had a health risk screening at the Washington University School of Medicine. He reported that he had difficulty walking and getting dressed but no difficulty with falling, bathing/grooming, eating/feeding, speaking, cooking, cleaning, shopping, driving, or remembering. His described the pain in his right leg as constant and aching. His medications were listed at Lotrel[11] and Topamax. (Tr. 431-32.)

The same day, plaintiff went to the Surgery Specialty Clinics at Barnes-Jewish Hospital for a follow-up to his hospitalization. Ryan Fields, M.D., reported that he was doing remarkably well subjectively, walking on crutches, and using a wheelchair as needed. Dr. Fields stated that his tracheostomy site and incision sites were well-healed. Dr. Fields stated that he had no general surgery needs. He also saw Chad A. Perlyn, M.D., complaining of a small wound from a cervical collar that Dr. Perlyn determined to be fully healed. (Tr. 433.)

On April 9, 2008, plaintiff followed up with Dr. Kottage at the Washington University School of Medicine. Dr. Kottage noted he did not have any headaches, dizziness, evidence of a seizure, cough chest pain, or palpitation. Dr. Kottage recorded his blood pressure as 140/100 and his motor power as 5/5 throughout. Dr. Kottage noted he was sitting comfortably in no acute distress. Dr. Kottage reported that plaintiff had significant tenderness in his right thigh and trochanteric area. Dr. Kottage noted possible instability in his right leg, and recommended that he use his cane more frequently with his left hand to balance the load on his right hip, but his right knee range of motion was significantly improved. Dr. Kottage stated he appeared to have an unstable right knees and likely secondary ligament injury. Dr. Kottage stated he should follow up with his primary care physician regarding his blood pressure management to avoid secondary complications. (Tr. 479-80.)

---

[11]Lotrel is used to treat high blood pressure. WebMD, http://www.webmd.com/drugs (last visited July 2, 2012).

On May 6, 2008, plaintiff followed up with Dr. Ricci of Washington University Orthopedics. Dr. Ricci reported that his wounds and bones were well healed and his range of motion in his hip and knee were without significant pain. Dr. Ricci stated he had a little bit of residual pain on his ankle, and recommended weight bearing and activities as tolerated and physical therapy for range of motion and strengthening. (Tr. 482-85.)

On May 14, 2008, plaintiff visited the Kneibert Clinic to have his cholesterol and blood pressure checked. Brian P. Hauser, M.D., noted that his blood pressure was better at 116/82, and that he appeared well nourished. He was tested for hepatitis which came back non-reactive. Dr. Hauser started him on Lisinopril.[12] (Tr. 509-17.)

On June 6, 2008, plaintiff returned to the Poplar Bluff Medical Center complaining of chest pain and left shoulder pain, and was seen by Dr. Hauser. Dr. Hauser reported that plaintiff had experienced deep pressure chest pains but none when walking around or working. He also reported no shortness or breath, wheezing, heartburn, or palpitations. Dr. Hauser found his musculoskeletal strength to be 5/5 and equal bilaterally although he did have pain in his right leg. Dr. Hauser noted that he could not walk very well, and advised him to continue his current medications for hypertension. (Tr. 601-03.)

The same day, plaintiff was seen by Dale Haggman, D.O., for a consultation related to his chest pain. Dr. Haggman listed his medications as Paxil, Zantac, Catapres, Zocor,[13] and Lisinopril. Dr. Haggman found him to be alert, oriented, very pleasant, and in no acute distress. (Tr. 606-08.)

On June 8, 2008, plaintiff was seen by Dr. Hauser complaining of insomnia. Dr. Hauser noted that he was in no acute distress, awake, alert, and oriented. Dr. Hauser found his heart rate to be regular

---

[12]Lisinopril is used to treat high blood pressure. WebMD, http://www.webmd.com/drugs (last visited July 2, 2012).

[13]Zantac is used to treat gastroesophageal reflux disease and stomach ulcers. Catapres is used to treat high blood pressure. Zocor is used to lower cholesterol. WebMD, http://www.webmd.com/drugs (last visited July 2, 2012).

- 8 -

without murmurs. Dr. Hauser recorded his blood pressure as 128/74. Subsequent chemical stress testing on June 9, 2008 revealed abnormal wall motion of the heart but normal ejection fraction with no signs of ischemia. Again, Dr. Hauser advised him to continue his current medications. (Tr. 611-12.)

On June 23, 2008, plaintiff visited Dr. Hauser and reported achy pain in right hip, knee, and ankle. Dr. Hauser stated he had a limp when walking, and difficulty walking long distances with a cane. Dr. Hauser recorded his blood pressure as 138/92. Dr. Hauser signed a Physician Statement for Disabled Person's License Plates/Placard indicating he was temporarily disabled for one year, allowing him to use handicapped parking. (Tr. 530-34.)

On July 22, 2008, plaintiff returned to Dr. Hauser to have his cholesterol and blood pressure checked and reported being stressed out due to family issues. Dr. Hauser reported his blood pressure as stable. (Tr. 535-41.)

On August 18, 2008, plaintiff completed a Disability Report - Appeal - Form SSA-3441. He stated his right leg hurt all the time when he stood on it or did a lot of walking. He stated he could not put pressure on his leg and that his leg gave out so he could not do a lot of walking. He also stated that his heart was still bruised and one wall of his heart does not work right. (Tr. 233-39.)

On June 22, 2009, plaintiff visited Burton Cox, D.O., at the Kneibert Clinic to re-establish a relationship with the clinic after nearly a year. Dr. Cox reported that he was not currently experiencing any pain and listed his medications as Celexa, Ibuprofen, Lisinopril, Catapres, Ranitidine, Niacin, Amlodipine Besylate, Paroxetine,[14] and Plavix. Dr. Cox described him as being overweight and appearing chronically ill. (Tr. 544-49.)

---

[14]Celexa is used to treat depression. Ranitidine is used to treat gastroesophageal reflux disease and stomach ulcers. Niacin is used to lower cholesterol. Amlodipine besylate is used to treat high blood pressure. Paroxetine is used to treat depression, panic attacks, obsessive-compulsive disorder, anxiety disorders, and post-traumatic stress disorder. WebMD, http://www.webmd.com/drugs (last visited July 2, 2012).

On July 22, 2009, plaintiff followed up with Dr. Cox for hypertension, high cholesterol, and anxiety. Dr. Cox listed his medications at Celexa, Ibuprofen, Lisinopril, Catapres, Ranitidine, Niacin, Amlodipine Besylate, Paroxetine, Plavix, and Trilipix.[15] Dr. Cox also wrote a letter indicating that it was her professional opinion that plaintiff was unable to hold down a permanent job due to his history of stroke and physical limitations. (Tr. 553-57.)

**Testimony at the Hearing**

On January 5, 2010, plaintiff appeared and testified before an ALJ. (Tr. 25-74.) Plaintiff testified to the following. He became disabled on December 15, 2007. On that date, he had a stroke while driving, causing him to drive into a tree while traveling at about 70 miles per hour. (Tr. 33.)

Plaintiff has done construction work as long as he can remember. He was first paid for construction labor when he was eighteen years old. He worked several jobs through out the 1990s. He began landscaping at that time and worked as a landscaper until 2003 when he attempted to start his own landscaping business with his ex-wife. He had no earnings from 2004 to 2006, as his self-run landscaping business was not successful. In 2007, he began doing general labor in the heating and air conditioning field. (Tr. 34-38.)

In the months leading up to his accident, plaintiff experienced severe headaches and migraines. He visited several doctors and received inconsistent diagnosis of multiple sclerosis. During this time, he was unable to work due to the headaches. The week of his accident, a specialist diagnosed him with severe migraines. (Tr. 39.)

Plaintiff has severe high blood pressure which is believed to be the cause of his stroke. He takes medication for his high blood pressure. He broke his right femur as a result of his car accident. His leg is now his number one concern regarding his ability to work. He is unable to walk, stand, or sit for a long period of time. He can stand for about

---

[15]Trilipix is used to lower cholesterol. WebMD, http://www.webmd.com/drugs (last visited July 2, 2012).

15 to 20 minutes, then must sit down. He requires a cane in order to keep his balance. He falls regularly due to the loss of his balance. If he puts weight on his right leg, he experiences pain. When seated in a straight chair, he must stand every 20 minutes to make himself more comfortable. (Tr. 41-47.)

In a seated position, plaintiff is able to lift three to four pounds. He can lift two gallons of milk. At the grocery store, he uses a cart for balance and is able to shop for approximately 25 to 30 minutes. (Tr. 46.)

Plaintiff lives in a trailer with his son. Prior to his accident, he was responsible for the care of the trailer but his son has taken over. He is able to help his son clean the kitchen, do dishes, remove clean laundry from the dryer, and fold the laundry. (Tr. 48-49.)

Plaintiff experiences dizzy spells when he bends over. He blacks out and gets light headed then falls onto the floor, and does not know when the dizzy spells will occur. His doctor believes the dizzy spells and light headedness may be related to his elevated blood pressure. (Tr. 49-50.)

Plaintiff is taking three medications for high blood pressure, a blood thinner, two medications for cholesterol, two anti-depressants, over-the-counter pain medication, Naproxen for inflamation and pain, medication to help him sleep, and stomach medicine that helps him keep all the other medications down. (Tr. 51-53.)

Plaintiff is still healing and has been told that he will either make a full recovery or have difficulties with his leg for the rest of his life. He has not completed formal physical therapy since 2008 but has attempted to do the prescribed exercises on his own. (Tr. 53-56.)

Plaintiff does not experience difficulties with his memory. He does experience occasional chest pain due to a cracked chest plate. He believes his fatigue is due to insufficient exercise. (Tr. 56-58.)

Prior to his accident, plaintiff was able to ride horses, barrel race, hunt, fish, and camp. Now, he is only able to pet the horses and must sit back and watch every one else have fun. (Tr. 60-61.)

Gary Weinholt, a vocational expert (VE), also testified at the hearing. The VE testified as to the following. Plaintiff worked as a

furniture assembler, a semi-skilled, heavy job; a deck hand, a semi-skilled, heavy job; a tire repairer, a semi-skilled, heavy job; a vehicle trainer, a medium level job; a tree trimmer, a semi-skilled, heavy job; a landscaper or landscape laborer, a medium level job; a general construction worker, a skilled, medium to heavy job; and a heating and air conditioning installer. (Tr. 64-66.)

    The ALJ then asked the VE to assume an individual of plaintiff's age and educational and professional backgrounds who was limited to the full range of medium work; could never crouch or crawl; was limited to occasional climbing, stooping, and kneeling; and would need to avoid all exposure to moving machinery and unprotected heights. The VE testified that the individual could not perform plaintiff's past relevant work. (Tr. 66.)

    The ALJ then asked the VE to assume an individual of plaintiff's age and educational and professional backgrounds who was limited to the full range of medium work; could never crouch or crawl; was limited to occasional climbing, stooping, and kneeling; would require a cane at all times for balancing; and must avoid all exposure to moving machinery, unprotected heights, and hazardous machinery. The VE testified that the individual could not perform plaintiff's past relevant work and that there would not be other medium jobs available for such an individual. (Tr. 67.)

    The ALJ then asked the VE to assume an individual of plaintiff's age and educational and professional backgrounds who was limited to the full range of light work; could never crouch or crawl; was limited to occasional climbing, stooping, and kneeling; would require a cane at all times for balancing; and must avoid all exposure to moving machinery, unprotected heights, and hazardous machinery. The VE testified that the individual could not perform plaintiff's past relevant work and that there would not be other jobs available for such an individual. (Tr. 67-68.)

    The ALJ then asked the VE to assume an individual of plaintiff's age and educational and professional backgrounds who was limited to the full range of sedentary work, could never crouch or crawl, was limited to occasional climbing, stooping, and kneeling, would require a cane at all

times for balancing and must avoid all exposure to moving machinery, unprotected heights, and hazardous machinery. The VE testified that jobs for such an individual could include pharmaceutical and other very small product packaging, copying and document imaging, work in plastic products, and some cashiering jobs. (Tr. 68-70.)

### III. DECISION OF THE ALJ

On May 12, 2010, the ALJ issued a decision that plaintiff was not disabled. (Tr. 9-20.) At Step One of the required sequential analysis, the ALJ determined that plaintiff had not been engaged in substantial gainful activity since December 15, 2007, the alleged onset date. At Step Two, the ALJ found that plaintiff has the severe impairments of residual limitations from a fractured right femur and a crushed right ankle. At Step Three, the ALJ found that plaintiff does not suffer from an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App'x 1. (Tr. 14-16.).

The ALJ then determined that plaintiff has the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. Parts 404 and 416 except standing and walking are limited to two hours with a sit/stand option on a 30-minute interval. He can no more than occasionally perform postural activities, and he can never climb ladders, ropes, and scaffolds. He must avoid all exposure to moving machinery, heights, and hazards. (Tr. 16-18.)

At Step Four, the ALJ found that plaintiff is unable to perform his past relevant work (PRW). The ALJ determined at Step Five that based on the VE's testimony, plaintiff is able to perform other work existing in significant numbers in the national economy. Accordingly, the ALJ concluded plaintiff was not disabled. (Tr. 18-20.)

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's final decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th

Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). Id. The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Id. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

## V. DISCUSSION

Plaintiff argues that the ALJ erred in (1) finding that Dr. Cox's opinion was not supported by medically acceptable clinical or laboratory

diagnostic techniques and was inconsistent with other medical evidence on the record; and (2) determining that he retained the residual functional capacity to perform other work.

**A.  The ALJ Properly Evaluated the Credibility of Dr. Cox's Findings**

Plaintiff argues that Dr. Cox's July 22, 2009 finding that he was unable to hold down a permanent job (Tr. 557) supports a finding of disability.  While a treating physician's opinions are given substantial weight, a physician's conclusory statement of disability without supporting evidence does not overcome substantial medical evidence supporting the ALJ's decision.  Loving v. Dept. of Health & Human Servs., 16 F.3d 967, 971 (8th Cir. 1994) (citing Browning v. Sullivan, 958 F.2d 817, 823 (8th Cir. 1992)).  A physician's medical opinion must be well-supported by medically acceptable clinical and laboratory diagnostic techniques and cannot be inconsistent with the other substantial evidence on record.  20 C.F.R. § 404.1527(d)(2).  The ALJ considered Dr. Cox's opinion that plaintiff was unable to hold down a permanent job due to a history of stroke and physical limitations.  (Tr. 18.)  Dr. Cox also mentioned that plaintiff was overweight and appeared chronically ill. However, no laboratory testing was performed and no specific findings were mentioned that would support a conclusion that he was unable to hold down a job.  (Tr. 544-82.)

An ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.  Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 1999).  Here, Dr. Cox's opinion conflicted with the medical assessment of Dr. Ricci who concluded that plaintiff was able to walk and bear weight on his right leg with the aid of a cane.  (Tr. 18.)  Dr. Ricci's opinion is accorded greater weight than a general physician such as Dr. Cox given her specialty in orthopedics.  20 C.F.R. § 404.1527(d)(5).  Dr. Cox mentioned plaintiff's alleged stroke as a reason he could not maintain permanent employment.  However, although plaintiff's carotid arteries were abnormal, no physician has proscribed him any work-related limitations.  (Tr. 15, 18.)  Additionally, after arriving at Barnes-

Jewish Hospital following his car accident, plaintiff reported that he had been drinking but he had no weakness or stroke symptoms. (Tr. 409.)

Thus, the ALJ did not err in concluding that Dr. Cox's opinion that plaintiff could not work conflicted with substantial medical evidence on the record.

**B.  RFC Determination.**

Plaintiff argues that the ALJ incorrectly concluded that he retained the RFC to perform light work with additional limitations. In determining a claimant's RFC, the ALJ should consider all relevant evidence, including objective medical records, observations of treating physicians, and an individual's subjective description of his limitations. Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). As a medical question, an ALJ's RFC assessment must be supported by at least some medical evidence of the claimant's ability to function in the workplace. Id.

Here, in determining plaintiff's RFC, the ALJ considered the objective medical opinion of Dr. Ricci and Dr. Cox regarding plaintiff's severe impairments and residual limitations from a fractured right femur and a crushed right ankle. While Dr. Cox concluded that plaintiff's physical limitations prevented him from being permanently employed, Dr. Ricci found that plaintiff was able to walk and bear weight on his right leg with the aid of a cane. (Tr. 18.) Since Dr. Ricci's opinion is accorded greater weight than a general physician given her specialty in orthopedics, 20 C.F.R. § 404.1527(d)(5), the ALJ did not err in relying on Dr. Ricci's opinion to support his RFC determination concerning the limiting effects of plaintiff's fractured right femur and crushed right ankle.

As to plaintiff's subjective complaints, the ALJ found his testimony not credible to the extent it conflicted with the ALJ's RFC determination. The ALJ's credibility findings must be supported by substantial evidence on the record as a whole. Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004). Credibility questions concerning a claimant's subjective testimony are "primarily for the ALJ to decide, not the courts." Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003).

Here, the ALJ found plaintiff's testimony concerning the intensity, persistence, and limiting effects of his symptoms not entirely credible in light of the medical evidence of the record. The ALJ noted that plaintiff only reported migraine symptoms to Dr. Parks on December 11, 2007. (Tr. 16); see Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003) (holding that failure to seek regular medical treatment is inconsistent with complaints of a disabling impairment). The ALJ also noted that plaintiff denied having headaches when visiting Dr. Kottage on April 9, 2008. Stephens v. Shalala, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam) (discrediting allegations of back pain when the claimant made no complaints about such pain while receiving other treatment).

Plaintiff contended that his motor vehicle accident was caused by a stroke. However, although plaintiff's carotid arteries were abnormal, no physician has imposed any work-related limitations. Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011) (holding that an absence of functional or work-related limitations supports an ALJ discrediting a claimant's testimony). Additionally, after arriving at Barnes-Jewish Hospital following his car accident, plaintiff reported that he had been drinking but he had no weakness or stroke symptoms. (Tr. 409.)

Plaintiff stated that his broken ribs and bruised lungs limited his ability to work. However, no physician noted that his rib fracture significantly limited his ability to perform work-related activities for a period longer than 12 months. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (holding that a lack of significant restrictions imposed by treating physicians supported the ALJ's decision).

While plaintiff alleged he had severe heart problems, no examination after June 2008 suggested any heart abnormality that would limit his ability to perform work-related activities. Johnston v. Apfel, 210 F.3d 870, 875 (8th Cir. 2000) (normal or unremarkable cardiac tests were inconsistent with complaints of disabling heart problems). Although he alleged difficulty in performing work-related activities, he stated that he was able to bathe, groom himself, cook, clean, drive, go shopping for 25 to 30 minutes using a cart for balance, and wash dishes and clothes with the help of his son. (Tr. 431); see Hines v. Astrue, 317 F. App'x 576, 580 (8th Cir. 2009) (holding that the ALJ is required to consider

claimant's daily activities in conjunction with medical evidence). Additionally, while plaintiff complained of allegedly disabling hypertension, his blood pressure improved to 138/92 by June 23, 2008 and remained stable throughout 2009. (Tr. 15-16.)

The ALJ also considered plaintiff's work history in evaluating his subjective complaints. The ALJ noted that between 1992 and 2003, plaintiff had only recorded earnings over $10,000 for five of the eleven years he had worked, calling his credibility into question. (Tr. 17, 199-205); Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) (explaining that a claimant's credibility is lessened by a poor work history).

In sum, the ALJ properly considered all of plaintiff's symptoms to the extent they were consistent with the objective medical evidence and plaintiff's credible testimony. Therefore, the ALJ's determination is supported by substantial evidence.

### VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

/S/    David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 17, 2012.